UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

MORTIMER EXCELL,

                                        Plaintiff,

            vs.                                                        9:05-CV-1231
                                                                       (LEK/GJD)
J.W. BURGE, et al.,

                                        Defendants.

_____

MORTIMER EXCELL
Plaintiff pro se
KRISTA A. ROCK, Asst. Attorney General
Attorney for Defendants

GUSTAVE J. DI BIANCO, United States Magistrate Judge

### REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the

Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C.

§ 636(b) and LOCAL RULES N.D.N.Y. 73.3(c).

In this amended civil rights complaint, plaintiff alleges that defendants have

violated his First Amendment right to practice his religion and have retaliated against

him for exercising his constitutional right to practice his religion. Amended Complaint

(AC)(Dkt. No. 7).  Plaintiff seeks monetary, declaratory, and injunctive relief.

Presently before the court is defendants' motion for summary judgment pursuant to

FED. R. CIV. P. 56. (Dkt. No. 39).  Plaintiff has responded in opposition to defendants'

motion. (Dkt. No. 50).  For the following reasons, this court recommends that

defendants' motion be granted in part and denied in part.

## DISCUSSION

### 1. <u>Summary Judgment</u>

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted).  "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*.  However, when the moving  party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id. See also Burt Rigid Box v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002)(citations omitted).  However, only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment. *Salahuddin v. Coughlin*, 674 F. Supp. 1048, 1052 (S.D.N.Y. 1987)(citation omitted).

### 2. <u>Facts</u>

Plaintiff alleges that, due to plaintiff's religious beliefs and practices, he was the subject of various forms of harassment by the defendants.  Plaintiff alleges that on June 12, 2005, he was "acosted [sic]" by defendants Simmons and Labetz, who used a "pat-frisk" procedure as an opportunity to verbally harass plaintiff about his race, his

Rastafarian religion, and his religious practice of wearing a "Tsalot-Kob."[1] AC ¶¶ 1-8. Plaintiff alleges that, in addition to verbally harassing plaintiff, defendants Simmons and Labetz threw plaintiff's Tsalot-Kob to the ground, stepped on it, and told plaintiff that it would be destroyed. AC ¶¶ 6-7.

As a result of this incident, plaintiff states that he was placed in keeplock[2] and given a misbehavior report, charging him with refusing a direct order; possession of contraband; harassment; and threats. AC ¶ 9.  Plaintiff states that the charges related to his possession of the Tsalot-Kob. *Id.*  Plaintiff states that the defendants believed that the Tsalot-Kob was contraband due to its particular color, and that defendants stated in the misbehavior report that plaintiff had previously been told to send the Tsalot-Kob home or destroy it, but he had not done so. *Id.*

Plaintiff states that he was afforded a disciplinary hearing on June 20, 2005. AC ¶ 10.  Plaintiff claims that although he produced a Department of Correctional Services (DOCS) Directive which allowed inmates to wear the multicolored headgear, he was still found guilty of all the charges except harassment and sentenced to thirty (30) days keeplock, with thirty (30) days loss of privileges. AC ¶ 10.  Plaintiff states that this determination was affirmed by defendant Burge, and although plaintiff sent a

---

[1] Plaintiff states that the "Tsalot-kob" is religious headgear worn exclusively by Rastafarian inmates. AC ¶ 2.  Department of Correctional Services (DOCS) Directive 4202 states that a Tsalot-Kob is a hemispheric head cap, worn by members of the Rastafarian faith, and is also known as a "crown." DOCS Directive 4202(M)(1)(c). Rock Decl. Ex. A.

[2] Keeplock is a form of disciplinary confinement where the inmate is confined to his own cell. *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989).

written complaint to Glenn Goord,[3] he "ignored" that complaint. AC ¶ 11.

Plaintiff claims that the harassment continued. AC ¶ 12. Plaintiff alleges that on July 20, 2005, he was attending a program, when defendant Hess told plaintiff to remove his Tsalot-Kob, and when plaintiff attempted to explain that he was allowed to wear the headgear, defendant Hess had plaintiff removed from the building and placed in keeplock. *Id.* Plaintiff claims that he was given another misbehavior report, charging him with being "out of place," stating that plaintiff should not have been in the school building because his name was not on the "call-out." AC ¶ 13. Plaintiff states that he was afforded a disciplinary hearing on July 23, 2005, but that all charges were dismissed. AC ¶ 14.

Plaintiff alleges that on July 26, 2005, he was in the mess hall, and defendant Simons began to harass plaintiff by calling him racially derogatory names. AC ¶ 15. Plaintiff states that defendant Simons told plaintiff to remove his Tsalot-Kob. *Id.* Plaintiff states that he asked defendant Simons why he continued to harass plaintiff about this headgear and asked to speak with the mess hall sergeant. *Id.* Plaintiff complained to the mess hall sergeant that defendant Simons was repeatedly harassing plaintiff about his cultural and religious beliefs as a Rastafarian. Plaintiff states that he further explained that defendant Simons had previously "illegally" confiscated the headgear and destroyed it without plaintiff's permission. *Id.*

Plaintiff states that defendant Simons denied harassing plaintiff, and instead

---

[3] Glenn Goord, the former Commissioner of DOCS has not been named as a defendant in this case, even though plaintiff sometimes refers to him as "defendant" Goord. *See* AC ¶ 19.

4

informed the mess hall sergeant that plaintiff had filed unfounded complaints against defendant Simons as well as other staff members. AC ¶ 16.  Plaintiff claims that the mess hall sergeant then had plaintiff removed from the mess hall, confiscated his Tsalot-Kob, and placed him in keeplock. *Id.*  Plaintiff claims that he was issued a third misbehavior report, dated July 27, 2005, charging him with contraband possession, lying, and refusing a direct order. AC ¶ 17.

Plaintiff states that on July 31, 2005, he was afforded a disciplinary hearing on these charges, and the charges were dismissed after plaintiff showed the hearing officer DOCS Directive 4202, authorizing him to have the multicolored headgear. AC ¶ 18.  Plaintiff claims that the hearing officer's disposition included an order to return plaintiff's Tsalot-Kob to him because it was not contraband. *Id.*  Plaintiff states that he wrote to defendant Burge and Glenn Goord, requesting a transfer out of Auburn Correctional Facility due to all the harassment to which he was being subjected regarding his religious headgear. AC ¶ 19.  Plaintiff claims that defendant Burge and Commissioner Goord ignored the request and were "negligent" in their performance. *Id.*

Plaintiff claims that the next incident was on August 4, 2005. AC ¶ 20.  Plaintiff alleges that he was attending a Rastafarian religious class, when defendant Devito came into the room to harass plaintiff about his multicolored Tsalot-Kob. *Id.* Defendant Devito also asked plaintiff why he was in the school building when he had previously been told not to return there. *Id.*  Plaintiff claims that defendant Devito and

5

"defendant Mcqueeney"[4] began verbally abusing plaintiff and threatening him with death if he filed any complaints against them. *Id.* Plaintiff claims that defendant Devito went into the Rastafarian class and told the members of the class that, if plaintiff's name was not removed from the "call-out," the organization would not be able to operate. *Id.*

Plaintiff states that he requested to speak with a sergeant, but that rather than comply with plaintiff's request, defendant Devito placed plaintiff in keeplock. AC ¶ 21. Plaintiff states that on August 5, 2005, he was given another misbehavior report, charging him with refusing a direct order. AC ¶ 22. Plaintiff claims that defendant Devito charged plaintiff with being in class with his shirt untucked. *Id.* Plaintiff claims that although the charges were dismissed at the August 9, 2005 disciplinary hearing, the hearing officer refused to give plaintiff a written disposition of dismissal. AC ¶ 23.

Plaintiff alleges that on August 9, 2005, he was in the mess hall, when defendant Sourwine began to harass plaintiff about his Tsalot-Kob. AC ¶ 24. Plaintiff claims that although he attempted to explain that, according to DOCS Directive 4202, he was allowed to wear the multicolored headgear, defendant Sourwine began verbally harassing plaintiff and ordered him to move to another serving line, where defendant Bray began to verbally harass plaintiff. *Id.* Plaintiff states that he was ultimately ordered to leave the mess hall without his meal. AC ¶ 24. Plaintiff states that he

---

[4] The court notes that although plaintiff refers to this individual as a "defendant" in the amended complaint, this person is not listed in the caption and was never served with process. Thus, this individual is not currently a defendant.

6

complained about defendants Sourwine and Bray to the mess hall sergeant. *Id.*
Plaintiff states that the mess hall sergeant reacted by ordering defendant Bray to
"remove" plaintiff from the mess hall and place him in keeplock. *Id.*

Plaintiff states that on August 14, 2005 he was given a misbehavior report,
charging him with violating a direct order, lying, movement, and violating mess hall
serving and seating policies. AC ¶ 25.  Plaintiff states that on August 14, 2005, he was
afforded a disciplinary hearing. AC ¶ 26.  Plaintiff claims that defendant Head, the
hearing officer, denied plaintiff his right to due process at the disciplinary hearing
when he denied plaintiff the opportunity to submit evidence in his behalf. *Id.*  Plaintiff
states that defendant Head told plaintiff to "stop bitchin [sic]" and had plaintiff
removed from the hearing. *Id.*  Plaintiff claims that defendant Head's actions were in
retaliation for plaintiff's grievances and complaints.  Plaintiff claims that he was found
guilty and sentenced to three (3) days keeplock with thirty (30) days loss of privileges.
*Id.*

Plaintiff claims that he has been the "continuous victim of racial and religious
discrimination" based upon his exercise of the Rastafarian religion and his right to
wear his multicolored religious headgear. AC ¶ 27.  Plaintiff states that he had
"repeatedly" complained to defendants Burge and Rourke as well as to Goord, and
"Gummerson"[5] to no avail. AC ¶ 28.  Plaintiff states that his life has been threatened
by "the defendants herein" and "other staff" that plaintiff did not name as defendants.

---

[5] This individual is also not named as a defendant in this case, even though plaintiff refers
to him in a list with other "defendant's [sic]." AC ¶ 28.

*Id.* Plaintiff also claims that he has "repeatedly" been the victim of false misbehavior reports that will ultimately affect the possibility of parole. *Id.*

Plaintiff states that the inmate grievance procedure has "repeatedly" failed to address his problems of religious discrimination. AC ¶ 29. The last paragraph of the factual portion of plaintiff's complaint purports to make some statements against an individual named G. Steinberg, regarding "six related false misbehavior report[s]," dated August 22, 2005. AC ¶ 30. Plaintiff has **not** named this individual as a defendant and states that his appeal of these misbehavior reports is still pending. *Id.* Plaintiff states that he is simply notifying the court of these separate incidents. *Id.*

The amended complaint contains four "Causes of Action." The First Cause of Action is against defendants Simons, Hess, Devito, Labetz, Bray, and Sourwine for violating plaintiff's First Amendment right to practice his religion. AC at p.13. Plaintiff claims that these defendants improperly confiscated his Tsalot-Kob in violation of DOCS own regulations. *Id.*

Plaintiff's Second Cause of Action is against defendants Simons, Hess, Devito, Labetz, Bray, and Sourwine for violating plaintiff's First Amendment rights by their repeated "religious discriminatory harassment." *Id.*

Plaintiff's Third Cause of Action is against defendants Simons, Devito, Labetz, Bray, Sourwine, and Head for knowingly filing false misbehavior reports against plaintiff in order to deliberately interfere with the practice of his religion. *Id.*

Plaintiff's Fourth Cause of Action is against defendants Burge and Rourke for knowingly disregarding plaintiff's complaints of religious discrimination and

permitting "various defendants" from interfering with the exercise of plaintiff's religious rights. *Id.* at p.14.

**3.    Personal Involvement**

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)(citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction.  *Id.*  The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong.  *Id.*  Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue.  *Id.*  Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event.  *Id.  See Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

In this case, defendants argue that plaintiff has not shown sufficient personal involvement by defendant Rourke in any alleged violations.  A review of the amended complaint shows that plaintiff has not alleged that defendant Rourke directly

participated in any of the alleged violations.  Plaintiff claims only that he "repeatedly complained" to a variety of supervisory officers, including defendant Rourke, "but to no avail." AC ¶ 28.  It is not clear from the amended complaint what sort of information, if any, defendant Rourke may have received about plaintiff's problem regarding his Tsalot-kob and his concerns about the other defendants.

Plaintiff has not alleged that defendant Rourke learned about plaintiff's situation through a report or appeal, and plaintiff has not alleged that defendant Rourke "created" any policy under which the constitutional violation was allowed to occur.  In fact, it appears from all of the documents submitted by both plaintiff and defendants that there was a misunderstanding regarding the authority of the plaintiff to wear a Tsalot-kob of any color.  The court notes that even if plaintiff had written his complaint to defendant Rourke, and he had ignored those complaints, it still would be insufficient to allege personal involvement by this defendant. *See Headly v. Fisher*, 2008 U.S. Dist. LEXIS 37190, * 17-18 (S.D.N.Y. May 8, 2008)(citing *Hernandez v. Goord*, 312 F. Supp. 2d 537, 547 (S.D.N.Y. 2004)).  Plaintiff has not responded to this argument in his opposition to summary judgment.  Thus, without more, the amended complaint may be dismissed as against defendant Rourke.

**4.    First Amendment and Retaliation**

In this case, the amended complaint may be read to allege two separate claims regarding plaintiff's religious rights.  Plaintiff first alleges that defendants Simons, Hess, Devito, Labetz, Bray, and Sourwine violated his First Amendment right to practice his religion by repeatedly confiscating plaintiff's Tsalot-Kob and harassing

10

him about being Rastafarian in violation of DOCS own directives. AC at p.13 (First and Second Causes of Action).

Plaintiff also claims that defendants Simons, Hess, Devito, Labetz, Bray, Sourwine, and Head "repeatedly caused the filing of false misbehavior reports" in a deliberate attempt to interfere with plaintiff's religion.  This claim can be interpreted as a claim that defendants retaliated against plaintiff for the exercise of his First Amendment rights. *Id.* (Third Cause of Action).  Plaintiff's final cause of action merely alleges that the supervisory officers disregarded plaintiff's complaints. AC at p.14. (Fourth Cause of Action).  The court will consider the First Amendment and the retaliation claims separately.

## A. Religion

It is well-settled that inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003)(citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.), *cert. denied*, 498 U.S. 951 (1990).  The analysis of a free exercise claim is governed by the framework set forth in *O'lone v. Estate of Shabazz*, 482 U.S.342 (1987) and *Turner v. Safely*, 482 U.S. 78, 84 (1987).  This framework is one of reasonableness and is less restrictive than ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588.

In *O'Lone*, the Supreme Court held that a regulation that burdens a protected

11

right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner*, 482 U.S. at 89).  An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir. 2006)(citations omitted).  In *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

Defendants argue that plaintiff does not have a "constitutional right" to wear a Tsalot-kob, and the mere violation of a state rule or regulation does not rise to the level of a constitutional claim.  Defendants cite two cases for the statement that there is no constitutional right to wear the plaintiff's religious headgear. Def. Mem. of Law at 15.  Defendants argue that in *Benjamin v. Coughlin*, 905 F.2d 571, 576-77 (2d Cir.), *cert denied*, 498 U.S. 951 (1990), the Second Circuit held that there is no First Amendment right to wear crowns while an inmate is in state custody.[6]

The court does ***not*** agree with the defendants' analysis of *Benjamin*.  The court in *Benjamin* found no First Amendment or equal protection violation in a challenge to the DOCS regulation restricting the wearing of crowns to designated areas. 905 F.2d at 578-79.  The reason for this holding was because defendants in *Benjamin*

---

[6] A "crown" is another name for the Tsalot-Kob.

12

successfully argued, based on *Turner* and *Shabazz*, that there was a legitimate security interest[7] in limiting this form of headgear, and distinguishing the crown from yarmulkes[8] and kufis[9] worn by inmates of other religions. 905 F.2d at 578-79.

Plaintiff is not challenging the directive in this case. In fact, the directive clearly supports plaintiff's ability to where whatever color Tsalot-kob he chooses to wear. DOCS Directive 4202(M)(1)(c) provides that

> Inmates are permitted to wear religious headcoverings in accordance with their religious beliefs and as permissible in a correctional setting. Some examples of approved religious headcoverings are:
> . . .
>> c.   Tsalot-Kob- is approved religious headwear for members of the Rastafarian religious faith. A Tsalot-Kob is a hemispheric head cap that can be made of cloth, knitted or crocheted, and ***may be multicolored or singled colored***. Only the smallest size is permitted. It measures approximately 12" long at its longest point in order to cover all locks. It must fit as close to the head as the locks permit. Note: This religious headwear is only authorized for members of the Rastafarian faith. . . . .

Rock Decl. Ex. A (emphasis added). It is clear that Directive 4202 was amended on June 7, 2004. Plaintiff's Resp. Ex. C (Revision Notice dtd. June 7, 2004). Prior to the amendment, the color of the Tsalot-Kob was restricted to black. *Id.* Even before the amendment the only issue was the ***color*** of the headgear, not whether it could be worn at all. *Id.*

---

[7] Yarmulkes and Kufis were smaller than crowns, and DOCS had determined that the larger headgear was more capable of being used to hide contraband. 905 F.2d at 579. The court found this to be a legitimate security concern. *Id.*

[8] Yarmulkes are worn by Jewish inmates.

[9] Kufis are worn in the Muslim religion.

Thus, it is clear that DOCS has determined that whatever security interest was present in Rastafarian inmates wearing their religious headgear has either been reconsidered or has been satisfied by the restriction on the size of the crown. Additionally, since the directive was amended to allow crowns of all colors, DOCS has made the determination that whatever security concern was present relating to the color of the crown has been satisfied.

Without the issue of a security interest, *Benjamin* is distinguishable from the case that is currently before the court. In *Benjamin*, the court found that the security interest outweighed what may have been a sincerely held religious belief. In this case, there is no dispute that plaintiff is Rastafarian, and there is no dispute that a Tsalot-Kob is a head covering worn by Rastafarian inmates. There is no issue or argument that confiscating or destroying this headgear would not infringe upon plaintiff's sincerely held religious belief. The difference in this case is that defendants are no longer claiming that a security interest outweighs or limits the plaintiff's right to perform the particular religious practice. Thus, *Benjamin* does ***not*** apply to show that there is no First Amendment right to wear a Tsalot-Kob.

In this case, plaintiff had two incidents with defendant Simons regarding the Tsalot-Kob. On June 17, 2008, plaintiff was issued a misbehavior report by defendant Simons, charging plaintiff with various rule violations, including possession of the allegedly contraband Tsalot-Kob. Pl. Mem. in Opp. Ex. A at 11. In the misbehavior report, defendant Simons states that he had told plaintiff on June 16, 2008 that he was not allowed to wear the "hat," and that he would have to "send it home, donate it, [or]

14

destroy it." *Id.*  Plaintiff was afforded a disciplinary hearing and was found guilty of all the charges but harassment by Lieutenant Redmond.[10]  Plaintiff was sentenced to thirty days of keeplock, together with a thirty day loss of privileges. *Id.* at 12. Although plaintiff alleges that the Tsalot-Kob was confiscated on June 17, 2005, it does not appear so from the misbehavior report.

However, on July 26, 2005, defendant Simons once again gave plaintiff a misbehavior report for wearing the multicolored headgear. *Id.* at 6.  The misbehavior report specifically states that the Tsalot-Kob was confiscated at that time and plaintiff was escorted to the package room, where he was told that it would be mailed home. *Id.* The misbehavior report also states that "[p]er directive Tsalot-Kob must be black in color." *Id.*

Plaintiff was afforded a disciplinary hearing on July 31, 2005. *Id.* at 7. Defendant Head was the hearing officer, and found plaintiff ***not guilty*** of all of the charges.  The disposition specifically states that plaintiff was ***not*** in violation of Directive 4202, and that the "officer was not aware" of the amendment, but instead had based his decision on the May 12, 2004 directive that ***did require*** all Tsalot-Kobs to be black. *Id.* at 8.  Defendant Head further stated that in the future "it is hoped no such occurrences [of] this error will happen again." *Id.*  Defendant Head also stated that the Tsalot-Kob "will be returned to you if not already sent home." *Id.*

It is unclear how long plaintiff was without his particular Tsalot-Kob, or whether he had another to wear.  Plaintiff alleges that he was wearing a Tsalot-Kob on

---

[10] Lieutenant Redmond is not a defendant in this case.

August 9, 2005, when plaintiff claims that defendant Sourwine told plaintiff to remove the Tsalot-Kob in the mess hall.  This court cannot, however, recommend granting summary judgment for defendants based upon the incorrect argument that plaintiff simply does not have a First Amendment right to wear a Tsalot-Kob.  The extent of any violation and any injury suffered as a result of that violation are genuine issues of material fact as against defendant Simons, who was involved in the removal and confiscation of the headgear on June 17, 2005 and July 26, 2005, and defendant Labetz, who was involved in the June 17, 2005 incident.

The court notes that plaintiff's first cause of action states that defendants Hess, Devito, Bray, and Sourwine violated plaintiff's First Amendment rights by "repeated" confiscation of plaintiff's head wear. AC at p.13.  There is no indication even in the documents submitted by plaintiff himself that any of these other defendants "confiscated" plaintiff's Tsalot-Kob.  At worst, plaintiff alleges that they verbally berated him about the color of his headgear.  However, it is well settled that verbal harassment, inexcusable as it may be, does not rise to the level of a constitutional violation. *Purcell v.  Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Ramirez v. Holmes*, 921 F. Supp. 204, 210 (S.D.N.Y. 1996).  Thus, other defendants' questioning plaintiff about his headgear and even verbally harassing him about his religion or his headgear does not rise to the level of a constitutional violation.

Plaintiff claims that on July 20, 2005, defendant Hess told plaintiff to remove his Tsalot-Kob, however, plaintiff does not allege that defendant Hess confiscated the headgear.  Plaintiff stated that defendant Hess had plaintiff placed in keeplock,

16

however, the misbehavior report issued to plaintiff on that date states only that he was "out of place" and not on the call-out for the class. Pl. Mem. in Opp. Ex. A at 9.  The charge must have been dismissed since no disposition of this misbehavior report appears on plaintiff's disciplinary history.  The same is true for the misbehavior report issued by defendant Devito, who gave plaintiff a misbehavior report on August 4, 2005 for having his shirt untucked. *Id.* at 10.  Plaintiff only claims that defendant Devito and another corrections officer commented on the Tsalot-Kob and threatened to kill plaintiff if he filed any complaint against them. AC ¶ 21.

Finally, defendants Sourwine and Bray are alleged to have verbally harassed plaintiff about the Tsalot-Kob, but plaintiff was placed in keeplock because he did not obey an order regarding the line in which he was supposed to be standing. AC ¶ 24; Head Decl. Ex. A (misbehavior report dated August 9, 2006).  There is no reference in the misbehavior report to plaintiff's religion or his headgear.

Thus, to the extent that defendants Hess, Devito, Bray, and Sourwine verbally harassed plaintiff about his religion or his headgear, they did not deprive plaintiff of his First Amendment right to practice his religion, and plaintiff's First Cause of Action may be dismissed as against these defendants.  The court will proceed to consider whether plaintiff may maintain a claim for retaliation against any of the defendants.

### B.  Retaliation

Any action taken by defendants in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Franco*

*v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988).  The law is well-settled that an inmate

has no right to be free from false accusations or false misbehavior reports, ***unless*** they

are made in retaliation for the exercise of a constitutional right. *Boddie v. Schnieder*,

105 F.3d 857, 862 (2d Cir. 1997)(citing *Franco*, 854 F.2d at 588-90).

In order to establish a claim of retaliation for the exercise of a constitutional

right, plaintiff must show first, that he engaged in constitutionally protected conduct,

and second, that the conduct was a substantial motivating factor for adverse action

taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir.

2003)(citing Gayle v. Gonyea, 313 F.3d 677 (2d Cir. 2002); *Hendricks v. Coughlin*,

114 F.3d 390 (2d Cir. 1997)).  The court must keep in mind that claims of retaliation

are "easily fabricated" and thus, plaintiffs must set forth non-conclusory allegations.

*Id.* (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other*

*grounds, Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)).

Although plaintiff in this case does not specifically use the word "retaliation,"

in his third cause of action, plaintiff claims that defendants Simons, Hess, Devito,

Labetz, Bray, Sourwine, and Head "repeatedly" caused the filing of false misbehavior

reports to "deliberately interfer [sic] with the practice of plaintiff's religious beliefs . .

." AC at p.13.  In his response to defendants' motion for summary judgment, plaintiff

does state that he was the "target of harassment and retaliation." Pl. Mem. in Opp. at 3.

To the extent that plaintiff's complaint can be interpreted to allege retaliation,

the court must recommend dismissal as to defendant Head.  Defendant Head was

assigned as the hearing officer after the August 9, 2005 mess hall incident.  The

misbehavior report had *nothing* to do with plaintiff's religion or headgear, and there is absolutely no indication that defendant Head would have had knowledge of any verbal exchange that plaintiff allegedly had in the mess hall with defendants Sourwine and Bray regarding his Tsalot-Kob.  The misbehavior report involved seating policies in the mess hall. Head Decl. Ex. A.  A review of the transcript of the disciplinary hearing shows that defendant Head attempted to have plaintiff testify regarding the specific facts of the incident, however, plaintiff wanted only to discuss his complaints of retaliation against the officers. Head Decl. Ex. B at 6-9.  Defendant Head ultimately removed plaintiff from the hearing. *Id.* at 8.  Any allegation that defendant Head was retaliating against plaintiff for his religion is completely conclusory and may be dismissed.

This finding is supported by the fact that defendant Head presided over the July 31, 2005 disciplinary hearing and found plaintiff ***not guilty of the contraband violation*** charged in defendant Simons's July 26, 2005 misbehavior report.   Plaintiff himself has submitted a copy of the misbehavior report and has included defendant Head's disposition. Pl. Mem. in Opp. Ex. A at 8.  In that disposition defendant Head finds fault with defendant Simons's handling of the entire situation. *Id.*  Defendant Head stated in his written decision that it was "hoped that no such occurrence [of] this error will happen again."*Id.*  There is absolutely no indication that defendant Head in any way was retaliating or "causing" false misbehavior reports to be filed against plaintiff.

The defendants did not address the issue of alleged retaliation in their motion

for summary judgment.  In fact, defendants do not include the misbehavior reports from the other dismissed charges.  Plaintiff has, however, included these reports.  One report stated that on July 20, 2005, plaintiff was "out of place" because he was not on the "call-out" for a particular class. Pl. Mem. in Opp. Ex. A at 9.  The report indicates that plaintiff was placed in keeplock as a result, but this incident is not listed on plaintiff's disciplinary history. *See* Head Decl. Ex. H.  On August 4, 2005, plaintiff was given a misbehavior report by defendant Devito, charging plaintiff with having his shirt untucked. Pl. Mem. in Opp. Ex. A at 10.  Once again, there is no record of this misbehavior report on plaintiff's disciplinary history report. Head Decl. Ex. H.

It has been held that "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Odom v. Dixion*, 04-CV-889, 2008 U.S. Dist. LEXIS 11748, *62-63 (W.D.N.Y. Feb. 15, 2008)(quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)).   In this case, although there was no disciplinary "sentence" relating to these two misbehavior reports, plaintiff does allege that he was placed in keeplock.

In *Dawes v. Walker*, 239 F.3d 489, 492-93 (2d Cir. 2001), the Second Circuit recognized that there are situations in which *de minimis* retaliation is "outside the ambit of constitutional protection." *Id.* (citing *Davidson v. Chestnut*, 193 F.3d 144, 150 (2d Cir. 1999)).  The court in *Dawes* held that **verbal** harassment was insufficient to rise to the level of adverse action. Id.  In *Dawes*, the court stated that prisoners may be required to tolerate more than either public employees or average citizens before a

20

retaliatory action can be considered "adverse." *Dawes*, 239 F.3d at 493 (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (2d Cir. 1999)).  The court in Dawes cited *Allah v. Seiverling*. *Id.* (citing 229 F.3d at 225).  In *Allah*, the Third Circuit held that in certain circumstances, "placement in administrative segregation would not deter a prisoner of ordinary firmness from exercising his or her First Amendment rights," however, the court was not prepared to hold that such action could never amount to adverse action. 229 F.3d at 225.

In this case, it is unclear how long plaintiff spent in keeplock as a result of the misbehavior reports that were ultimately dismissed.  He spent thirty days in keeplock after being mistakenly found guilty of possession of contraband as a result of defendant Simons's first misbehavior report.  It is also true that the two misbehavior reports for which there is no disposition purportedly did not have anything to do with plaintiff's religion, however, if these misbehavior reports were given to plaintiff because he was Rastafarian or because of his religious practice of wearing a crown, plaintiff could state a claim for retaliation.

The court also notes that if defendants would have taken the same action absent the protected conduct, they will have a defense to retaliation. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).  However, it is the defendants' burden to show by a preponderance of the evidence that they would have taken the same action absent the protected conduct. *Id.*  Since defendants in this case do not make any argument regarding retaliation, the court will not recommend granting summary judgment on the issue of retaliation as against defendants Simons, Devito, Hess, and Sourwine.

21

**5.    Due Process**

In order to begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996).  In *Sandin v. Conner*, the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).  In *Sandin*, the court rejected a claim that thirty days in segregated confinement was "atypical and significant." *Id.* at 486.

The Second Circuit has discussed the duration element of the *Sandin* analysis. *Colon v. Howard*, 215 F.3d 227 (2d Cir. 2000).  In Colon, the court discussed whether it was appropriate to have a "bright line" rule regarding the maximum length of confinement in the Special Housing Unit (SHU) before a liberty interest might be created. *Id.*  The court concluded that ***305*** days in SHU would meet the standard. *Id.* at 231.  Although Judge Newman believed that the court should articulate a bright line rule, holding that any SHU confinement less than 180 days would not create a liberty interest, the panel disagreed. *Id.* at 234.

22

It is true that the court must consider conditions as well as duration, however, sentences of 125 to 288 days are "relatively long" and necessitate "'specific articulation of . . . factual findings" before the court could determine whether the "hardship" was atypical and significant. *Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000)(citation omitted).  The court in Colon also noted that the longest confinement in SHU that did not meet the atypical requirement was ***101*** days. *Id.* at 231 (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90(2d Cir. 1999)).

Plaintiff does not include a due process claim against defendant Head in his "Causes of Action."  Defendant Head is only included in the third cause of action, alleging that he was involved in "repeatedly" causing false misbehavior reports to be written.[11]  However, in the body of the complaint, plaintiff does appear to claim that defendant Head violated plaintiff's due process rights by excluding him from the disciplinary hearing of August 14, 2005 and by refusing to call certain witnesses. AC ¶ 26.

In any event, defendants argue that plaintiff cannot establish a due process violation against defendant Head.  This court agrees with defendants.  Plaintiff received only thirty days in keeplock as a result of the August 9, 2005 mess hall incident.  As stated above, keeplock involves an inmate being confined to his own cell, and there is no deprivation of property associated with this form of confinement. *Sandin* was clear in its holding that a thirty day confinement, even in a special housing unit, would not rise to the level of a liberty interest. 515 U.S. at 486.  The Second

---

[11] This is the retaliation claim discussed above.

23

Circuit's decision in *Colon* is consistent with this holding.  Thus, plaintiff in this case had no liberty interest in being free from thirty days keeplock, and to the extent that plaintiff may be trying to allege a due process claim as against defendant Head, any such claim may be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 39) be **GRANTED IN PART**, and that the complaint be **DISMISSED IN ITS ENTIRETY AS AGAINST DEFENDANTS HEAD and ROURKE**, and it is

**RECOMMENDED**, that plaintiff's First Cause of Action be **DISMISSED AS AGAINST DEFENDANTS HESS, DEVITO, BRAY and SOURWINE**, and it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 39) be **DENIED IN ALL OTHER RESPECTS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: September 10, 2008

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge